## UNITED STATES BANKRUPTCY COURT FOR
## THE DISTRICT OF COLORADO

| | |
|---|---|
| IN RE:<br>RAINBOW PARK DAIRY, INC.<br>EIN: XXX-XX-8963<br><br>    Debtor. | Case No. 09-29684 MER<br><br>Chapter 11 |
| IN RE:<br><br>WILLIAM C. MCCONNELL,<br>SSN: XXX-XX-9959<br>JO ELYN J. MCCONNELL<br>SSN: XXX-XX-7667<br><br>Debtors. | Case No. 09-29687-EEB<br><br>Chapter 11 |
| RAINBOW PARK DAIRY, INC.,<br>WILLIAM C. MCCONNELL, an Individual, and<br>JO ELYN J. MCCONNELL, an Individual<br><br>    Plaintiffs,<br><br>vs.<br><br>DAVID BASHOR and ELIZABETH BASHOR<br>Individuals<br><br>    Defendants. | Adversary Proc. No. 09-___ |

## COMPLAINT

Rainbow Park Dairy, Inc., William C. McConnell and Jo Elyn J. McConnell ("Plaintiffs"), by and through their attorneys, Kutner Miller Brinen, P.C., and as their Complaint against David Bashor and Elizabeth Bashor ("Defendants") states as follows:

## I. JURISDICTION

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157.

2. This adversarial proceeding is brought pursuant to Fed. R. Bankr. P. 7001 and §§ 506, 541, 544, 548 and 551 of Title 11, U.S. Code (Bankruptcy Code).

3. Venue is proper pursuant to 28 U.S.C. §1409 (a).

4. This matter is a core proceeding for the recovery of fraudulent transfers and for a determination of secured status pursuant to 28 U.S.C. §157 (b)(2) (A), (B), (H), (K) and (O).

## II. GENERAL ALLEGATIONS

5. Plaintiff Rainbow Park Dairy, Inc. ("Rainbow") and Plaintiffs William C. McConnell and Jo Elyn J. McConnell ("McConnells") filed for relief under Chapter 11 of the Bankruptcy Code on September 21, 2009 and October 9, 2009 respectively, and the Plaintiffs remain as a Debtors-in-Possession in their respective cases.

6. Plaintiff Rainbow owns and operates a dairy which produces milk and milk products in the State of Colorado.

7. Defendants are individuals who reside in the state of Colorado and who are the owners and operators of the Rainbow Dairy.

8. Plaintiffs were engaged in a pre-petition banking relationship with New Frontier Bank ("NFB"). NFB was a Colorado state banking corporation, having its principal place of business at 2425 35th Avenue, Greeley, Colorado, 80634.

9. Within NFB, all lending actions taken with respect to Rainbow were considered and approved by NFB's Board of Directors.

10. This matter arises of the inequitable and illegal conduct between 2005-2008 with respect to NFB's disguised financing of Rainbow and the McConnells through "cow lease" arrangements through Defendant, made to Plaintiffs in 2007.

11. Defendant is a party to a Cow Lease Agreement dated June 15, 2007 ("CLA"), which served as disguised financing from NFB to Rainbow.

## III. FACTUAL ALLEGATIONS

**A. NFB's Non-Compliance With Banking Regulations**

12. U.S. banks are subject to certain federal and state banking regulations intended to secure depositors' money and maintain the capital market's integrity. In basic terms, banks are required to maintain a certain amount of capital relative to the money they lend. Banks are also subject to certain lending limits intended to protect depositors if one customer fails, limiting the amount of its capital a bank may lend to any one customer.

13. Unbeknownst to the public, NFB was out of compliance with governing banking regulations for the past few years. NFB had made a practice of aggressively lending money well beyond what its capital reserves permitted. By 2008, NFB held past due loans and foreclosed real estate worth more than 100 percent of its capital. NFB was also in violation of its lending limits.

14. After uncovering NFB's regulatory violations, in February 2008, various state and federal regulatory authorities, including the Federal Deposit Insurance Corporation ("FDIC") issued a Memorandum of Understanding ("MOU") to NFB. The MOU required NFB to come into regulatory compliance, increasing capital on hand versus money loaned. As a result, during 2008, NFB was under intense regulatory scrutiny as the regulators attempted to enforce the MOU. As described below, NFB improperly used its customers, including Plaintiffs, to attempt to increase capital and satisfy bank regulators in 2008.

15. Despite the FDIC's issuance of the MOU, NFB remained in violation of banking regulations. Finally, on December 2, 2008, the FDIC issued a Cease and Desist Order ("CDO"), which required the Bank to immediately cease the above practices and comply with regulations. Among other things, the CDO requires the bank to: (i) immediately start operating with adequate capital protection and liquidity; (ii) reduce concentrations of credit; (iii) reduce dependence on short-term brokered deposits; (iv) improve supervision and loan policies and procedures; (v) charge-off bad debt; and (vi) correct inaccurately reported financials. Subsequently, NFB has been taken over by the FDIC.

## B. Defendants' Illegal and Inequitable Cow Lease Agreements

16. In early 2007, Plaintiffs sought to expand Rainbow's milk barn, at the suggestion of Greg Bell, Plaintiffs' loan officer at NFB. NFB wanted to lend money to Plaintiffs for the expansion; however, after earlier loans were made from NFB to Plaintiffs, NFB was upon information and belief already at its lending limits with respect to the Plaintiffs, given NFB's amount of capital on hand.

17. Seeking ways to circumvent its regulatory limits and loan more to the Plaintiffs than it would conventionally be allowed to loan, NFB facilitated a cow lease arrangement with the Plaintiffs, via the CLA at issue herein. NFB undertook the same action with respect to other, unrelated NFB customer borrowers.

18. The cow lease arrangements, including the CLA which is the subject of this matter, generally worked as follows: (a) First, a bank director, family member or friend of a bank officer, would put up a small amount of capital or collateral with NFB, and agree to serve as an "owner" or "lessor" in an outside agreement with the borrower; (b) Second, NFB would loan money to the "owner" or "lessor," at an interest rate of 8-9%; (c) Third, the "owner" or "lessor" would provide close to the same amount of money to the borrower to "buy" heifers or cows from the borrower; (d) Under the same or subsequent agreement, the borrower would lease back the same cows for a cost of approximately 8-9% more annually than what the "lessor" had paid and borrowed from NFB; (f) As such, the borrower would effectively borrow money from NFB paying double interest – interest to the "lessor" as well as interest on the lessor's loan from the Bank; (g) The cows would never leave the borrower's property, and the risk of death or disease, as well as all other incidents of ownership, remained with the borrower; (h) The right to depreciate, however, went to the "owner" or "lessor," resulting in an additional financial gain to the "owner" or "lessor," because his/her entire income would be offset and he/she would therefore pay no income tax on other, unrelated income during the term of the cow lease. This is precisely what occurred between the Plaintiffs and Defendants herein, via the CLA.

19. The CLA (a) was a disguised financing agreement intended to loan money to the Plaintiffs in contravention of banking regulations; (b) substantially enriched the

4

"owner" or "lessor" to the detriment of the Plaintiffs; and (c) was substantially created and facilitated by Bell and Defendants.

20. When the Plaintiffs required funds in mid-2007, NFB was already at its lending limit with the Plaintiffs. In order to solve this problem, Bell, with the apparent consent of Defendants, drew up the CLA.

21. The "lessors" chosen by Bell were the Defendants ("Defendants" or "the Bashors").

22. The CLA, drafted by Bell, was entered into on June 15, 2007, thereby increasing the Bank's disguised financing to the Plaintiffs.

23. NFB loaned the Bashors capital so that the Bashors could purchase a total of 510 milk cows from the Plaintiffs, who would in turn lease the same cows back from the Bashors for a monthly lease payment of $14,600. On information and belief, the Bashors kept some portion of this lease payment amount, with the remainder going to NFB to service NFB's note from the Bashors, with interest, made specifically for the cow lease arrangement with the Plaintiffs.

24. upon information and belief, all incidents of ownership, except depreciation, remained with the Plaintiffs. The Bashors enjoyed depreciation of the cows which, upon information and belief, resulted in their paying no income taxes during the entire lease (2007 to present).

25. At the end of five and one/half years (66 months) years, the Plaintiffs could either (a) refinance or continue making lease payments to the Bashors, or (b) buy back the cows for $300 per head, or approximately $153,000, plus pay the balance and interest on the Bashors note to NFB. After the 10.5 year term of the lease, the Plaintiffs would own the cows automatically (for a $1 payment).

26. The Bashor lease provided that (a) the cows never left the Plaintiffs' property, (b) the Plaintiffs' were entitled to all milk from the cows, (c) the Plaintiffs owned all calves born of the leased cows, (d) all risks, including death or disease, were born by the Plaintiffs, and (e) the Plaintiffs were responsible for feeding the cows. In other words, all substantive incidents of ownership remained with the Plaintiffs (only depreciation went to the "lessor").

27. The CLA did more than serve as disguised financing arrangements by which NFB could loan money to the Plaintiffs in violation of regulatory limits. Upon information and belief, the CLA also provided incentive payments to the Bashors at expense of the Plaintiffs. For example, the difference between the Bashors' monthly payment on their monthly loan from NFB and the Plaintiff's monthly "lease" payment to the Bashors (the "spread") appears to have amounted to $1,500. The rest went to the Bank as payment, with interest, on the NFB loan to the Bashors. As a result, the Bashors would profit significantly over the 10-year term of the lease, from Plaintiffs. Plaintiffs would pay all interest on the money the Bashors borrowed. The Bashors would also profit by paying no income tax as a result of taking the depreciation on the "leased" cows. Additionally, NFB would receive its 8 to 9% interest and initial loan fees, from the Plaintiffs, on its note to the Bashors.

## IV. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
(Civil Conspiracy To Breach Fiduciary Duty)

28. Plaintiffs reallege Paragraphs 1 through 27 of the Complaint as if fully set forth herein.

29. NFB was a fiduciary of the Plaintiffs and as such, owed the Plaintiffs the duties of candor, loyalty and good faith.

30. Defendants conspired with NFB in its breach of fiduciary duty to the Plaintiffs. Specifically, Defendants conspired with Bell and NFB to enter into the CLA described above, understanding and agreeing that said CLA was nothing more than a disguised loan arrangement that contained improper and unreasonable payments to them in the form of commercially unreasonable spreads.

31. By inducing and compelling the Plaintiffs to enter into said agreements, NFB breached its fiduciary duty to Plaintiffs.

32. Said conduct of Defendants was willful and wanton.

33. By reason of such conspiracy, Plaintiffs have been injured and harmed, and are entitled to recover their actual damages, their costs of suit, and interest.

## SECOND CLAIM FOR RELIEF
(Aiding and Abetting Breach Of Fiduciary Duty)

34. Plaintiffs reallege Paragraphs 1 through 33 of the Complaint as if fully set forth herein.

35. NFB owed Plaintiffs the fiduciary duties set forth herein, and NFB breached its fiduciary duty to the Plaintiffs.

36. Defendants aided and abetted NFB's breach of its fiduciary duties by knowingly and intentionally participating in or receiving the benefit of the various breaches described hereinabove.

37. By reason of such aiding and abetting the breach of fiduciary duty, the Plaintiffs have been injured and harmed, and is entitled to recover their actual damages, its costs of suit, and interest.

## THIRD CLAIM FOR RELIEF
(Fraudulent Concealment)

38. Plaintiffs reallege Paragraphs 1 through 37 of the Complaint as if fully set forth herein.

39. Upon information and belief, Defendants fraudulently concealed (a) the true amount of pecuniary benefits they were receiving by virtue of the CLA, at the expense of the Plaintiffs; and (b) that upon information and belief, the Bashors had placed insufficient collateral with the Bank on their loan related to the CLA, such that the return they were getting on their equity, at the Plaintiff's expense, was unreasonably high.

40. Defendants concealed these facts with the intent of creating a false impression of the actual facts in the Plaintiffs' minds, and with the intent that Plaintiffs enter into agreements they otherwise may not have.

41. The Plaintiffs entered into the CLA without knowing the above facts.

42. Because Defendants concealed these facts, the Plaintiffs' reliance was justified.

43. By reason of said fraudulent concealment, the Plaintiffs have been injured and harmed, and are entitled to recover their actual damages, costs of suit, and interest.

## FOURTH CLAIM FOR RELIEF
(Unjust Enrichment)

44. Plaintiffs reallege Paragraphs 1 through 43 of the Complaint as if fully set forth herein.

45. As a result of the improper conduct of Defendants as described herein, they were unjustly enriched at Plaintiffs' expense under circumstances that would make it unjust for them to retain the benefit. Defendants received a benefit at Plaintiffs' expense under circumstances, as more fully described above, that make it unjust for the Defendants to retain such benefit without commensurate compensation.

46. Such benefits include the pecuniary benefit said Defendants received by virtue of the CLA.

47. By reason of such improper conduct, Plaintiffs have been injured and harmed, and are entitled to recover those amounts that Defendants were unjustly enriched, their costs of suit, and interest.

## FIFTH CLAIM FOR RELIEF
(Declaratory Judgment under 28 U.S.C. §2201 and Determination of Secured Status Pursuant to 11 U.S.C. § 506(a))

48. Plaintiffs reallege Paragraphs 1 through 47 of the Complaint as if fully set forth herein.

49. Pursuant to Rule 57 of the Federal Rules of Civil Procedure and Rule 7057 of the Federal Bankruptcy Rules of Civil Procedure, Plaintiffs requests a declaration from the Court that based on the facts fully set forth herein, that the CLA arrangements entered into between the Plaintiffs and Defendants are nothing more than a disguised financing arrangement, which is equivalent to a sale of the cows on installment, with a security interest taken back by said Defendants, which security interest was unperfected at the time the Plaintiffs filed their petitions in bankruptcy, the result of which is that said Defendants are unsecured creditors at best, and the Plaintiffs are the true owners of the cows referenced in such CLA.

## SIXTH CLAIM FOR RELIEF
(Equitable Subordination of the Bashor Claims
– 11 U.S.C. § 510(c))

50. Plaintiffs reallege and reincorporate herein paragraphs 1 through 49 of this Complaint as if fully set forth herein.

51. Defendants, through the artifice of the CLA, have engaged in inequitable conduct, including but not limited to aiding and abetting a breach of fiduciary duties.

52. The inequitable conduct referred to herein has caused injury to creditors of the Plaintiffs, and Defendants have attempted to gain an unfair advantage over such creditors via the CLA.

53. Under these circumstances, it is consistent with the provision of the Bankruptcy Code to equitably subordinate the Bashors' lien positions and claims, if any, to the claims of all administrative, priority and unsecured creditors of the estate.

54. The Bashor lien created under the CLA, if any, once subordinated, should be transferred to the estate pursuant to 11 U.S.C. § 510(c)(2).

WHEREFORE, the Plaintiffs pray as hereinafter set forth.

### V. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered on its Complaint against Defendants as follows:

a. Actual, compensatory, and treble damages caused by Defendants in an amount to be determined at trial;

b. Pre- and post-judgment interest, costs incurred, and reasonable attorneys' fees as authorized by law;

c. Discharge of Plaintiffs' debt related to the cow lease arrangements described above; or in the alternative, subordination of the related debt;

d. A declaration that the cow lease arrangement entered into between Plaintiffs and Defendants is a disguised financing arrangement, which is equivalent to a sale of the cows on installment, with a security interest allegedly taken back by said Defendants, which security interest was unperfected at the time Plaintiffs filed their petitions in bankruptcy, and that, accordingly, said Defendants are unsecured creditors, and Plaintiffs are the true owners of the cows referenced in such cow lease agreements; and

  e.  Such other and further relief as the Court deems just and proper.

Dated: October 14, 2009.

              Respectfully submitted,

              By: _____
                Lee M. Kutner #10966
                David M. Miller, #17915

                KUTNER MILLER BRINEN, P.C.
                303 E. 17th Avenue
                Suite 500
                Denver, CO 80203
                Telephone: (303) 832-2400
                Facsimile: (303) 832-1510
                Email: dmm@kutnerlaw.com